**Arlene REAMES, Plaintiff-Appellant,**

**v.**

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Defendant-Respondent.**

**Arlene REAMES, Plaintiff-Respondent,**

**v.**

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Defendant-Appellant.**

Nos. 8040, 8041.

Springfield Court of Appeals.

Missouri.

June 20, 1962.

Motions to Modify to Transfer to Supreme Court, and for Rehearing Denied July 18, 1962.

Application to Transfer to Supreme Court Denied Sept. 10, 1962.

Jones & Jones, Langdon R. Jones, Robert H. Jones, Kennett, for Reames.

. Ward & Reeves, Caruthersville, for St. Louis-San Francisco R. Co.

McDOWELL, Judge.

Arlene Reames, plaintiff-appellant, brought this action in the Circuit Court of Dunklin County, Missouri, against defendant, St. Louis-San Francisco Railway Company, a corporation, for damages in the sum of $25,000.00 for the wrongful death of her husband, Homer Reames, killed January 4, 1960, on Highway EE, being the north by-pass, in the city of Kennett, when deceased's automobile crashed into the side of defendant's diesel engine,

momentarily stopped on the railroad crossing.

The cause was tried by jury and a verdict and judgment rendered for plaintiff for $12,500. Both parties appealed. Since the appeals are by opposing parties from the same judgment, they are consolidated in this court for opinion.

Plaintiff's appeal is case No. 8040. The issue presented is limited to damages only.

Defendant's appeal is case No. 8041, and involves the sole question of whether or not plaintiff made a submissible humanitarian negligence case against defendant based upon the failure of defendant to sound a warning signal as deceased Reames' automobile approached defendant's engine.

Plaintiff's petition is in conventional form, both primary and humanitarian negligence are charged.

The answer admitted the formal allegations of the petition but denied all other allegations of negligence, both primary and humanitarian.

In the trial plaintiff abandoned acts of primary negligence and submitted her case on humanitarian negligence.

The jury found the issues for plaintiff and assessed her damages at $12,500. On this verdict the court entered judgment.

Defendant's motions for directed verdict at the close of plaintiff's case and at the close of the whole case and its after-trial motion for judgment in accordance with its motion for directed verdict were overruled.

Motions for new trial were filed by both plaintiff and defendant and both parties appealed.

The evidence necessary to determine the issues involved in plaintiff's appeal, case No. 8040, is as follows: By stipulation it is agreed that at the time of the death of Homer Reames he was in good health, 58 years of age at his next birthday and earning $6,540.00 per year before taxes. It was admitted that according to the American Experience Table of Mortality the prospective life of a man 58 years old is 15.39 years; that deceased, Homer Reames, was a man of good habits.

Plaintiff testified she was the age of 55 years and at the time of trial was a saleswoman; that the deceased paid the expenses of the home; that at the time of his death the only members of the household were plaintiff and deceased; that he helped her on Saturday afternoons and Sundays, took care of the car, mowed the lawn, cleaned the stove and refrigerator, paid all the bills, did grocery shopping and drove the family automobile. She stated her health was good. By stipulation it was admitted that according to the American Experience Table of Mortality, the life expectancy of a woman 55 years of age is 17.40 years; that at the time of the death of deceased he was manager of the Arkansas-Missouri Power Company at Kennett.

The case in appeal No. 8041 was submitted solely on humanitarian negligence for alleged failure of engineer Ryan to sound a warning signal as the Reames automobile approached the diesel engine standing across the highway. The issue presented is whether a jury case was made on this theory. We will state the facts shown by plaintiff's evidence from the viewpoint most favorable to her.

Highway EE, being the north by-pass in Kennett, runs generally north and south through the western edge thereof and circles northeasterly around the north side. Defendant's railroad runs generally east and west and crosses this highway. There are two industries served by the railroad in this part of the city, one about 600 feet east of the highway and the other immediately west of the highway and just south of the tracks. On the night of January 4, 1960, the local freight train switcher of defendant had done switching at the industry some 600 feet east of the by-pass after which the diesel engine, with two box

cars attached, proceeded west for the purpose of dropping a car at the industry immediately west of the by-pass. The switch stand for this industry was just west of the by-pass. The engine pulled on and across the by-pass at a slow rate of speed with the front end of the engine some 7 to 20 feet beyond the west edge of the pavement so the trainmen could ascertain if there was room to spot the car on the spur serving the industry as there were other cars already on the spur track. The rear of the engine was near the east edge of the pavement. The engine is approximately 55 feet long and 14 feet high.

At the time the engine approached and stopped on the highway, the engineer was on the fireman's side on the south side of the engine and the fireman was the acting engineer on the north side. The two brakemen rode the front of the engine. When the train stopped Bob Clippard, the head brakeman, got off the engine and stood on the crossing on the north side with his lantern to flag traffic coming from the north. He testified that the other fireman, Smiley, got off and walked ahead of the engine; that no one was flagging the south side of the engine. There was no traffic approaching the crossing on Highway EE from either direction.

The evidence is that as the train approached the crossing whistle signals were given but none were given after the engine stopped. The whistle signal could be sounded by either the fireman or engineer without moving from their seats.

The diesel engine had been stationary on the by-pass crossing from 12 to 25 seconds when deceased crashed into the south side of it near the steps on the rear thereof, about 7:32 P.M.

Clippard testified that he did not see the plaintiff's automobile but heard the impact when it struck the engine; that when he went around the front of the engine the headlights on the Reames car were not burning. He stated the headlight on the engine was not shining on the highway during the 15 to 25 seconds that the engine was stationary on the crossing.

The width of the by-pass highway was 19.6 feet and practically level at the crossing. The highway is straight for a distance of 375 feet south of the crossing where a slight curve begins, but the sight distance along the highway to the south from the crossing is 1496.50 feet. There is a highway railroad crossing sign south on the east side of the by-pass 549 feet south of the crossing. The crossing was also protected by cross-arms. The evidence is that there was a white house on the west side of the by-pass, south of the crossing, 788.6 feet and a red brick house south of the crossing on the west side of the highway 1004.4 feet.

The diesel engine was painted a dark color with large yellow stripes on its sides which illuminates when lights shine on it. During the 12 to 25 seconds the engine was on the crossing, prior to the collision, the headlight was burning, and the number lights on the south side and near each end of the engine were burning, as well as a light near the cab and these lights can be seen for a distance of 200 feet.

The diesel engine on the crossing was plainly visible to deceased when he was at the first white house on the west side of the by-pass and south of the crossing, a distance of 788.6 feet. On the night in question it was cloudy and cold but visibility was good.

No member of the train crew saw the Reames automobile until almost the instant of impact at which time engineer, Ryan, heard the "squeal on the pavement". He then turned his head and saw the Reames car. The deceased had attended a stag dinner and was returning home on the by-pass. His hearing and eyesight were good, the headlights on his automobile were burning before the collision. His car skidded on the east lane of blacktop by-pass for 66 feet before it struck the diesel. He

was traveling at the time he crashed into the engine 65 miles per hour. He was well acquainted with the by-pass and the railroad crossing. Under the city ordinance, in evidence, the speed of a motor vehicle on this by-pass is limited to 40 miles per hour.

By agreement exhibits 1 through 14 were offered by defendant and exhibit (A) was offered by plaintiff. Exhibits 1, 2, 3, 4, 6 through 14 are photographs. Exhibit 5 is a rough plat of the scene of the accident. Plaintiff's exhibit (A) is a large plat of the scene of the accident and Highway EE prepared by a civil engineer.

Plaintiff principally relied upon members of the train crew as her witnesses. Highway Patrolman, Frank Sheible, was called by defendant. He arrived at the scene of accident a few minutes after the collision.

This appeal is limited to the sole question of the alleged error of the trial court in failing to direct a verdict in favor of defendant and in failing to sustain defendant's after-trial motion for a judgment notwithstanding the verdict.

Witnesses Bill Meredith and his wife testified that they are residents of Kennett; that on the night Homer Reames was killed they were driving south in a pickup truck on Highway EE and crossed the railroad tracks as defendant's train was approaching the crossing. Mr. Meredith was driving and his wife was sitting in the front seat on the right side. Meredith testified that as they crossed the tracks the train was approximately 300 yards back to the east of the highway; that they went south to the intersection of Washington Avenue where they turned off; that the distance from the defendant's tracks to Washington Avenue was approximately one-half mile. He gave this testimony:

"Q. Now, after you crossed the railroad tracks did you meet any other cars? A. I met one car." He testified the car he met was traveling north; that at the time he met it it was about a quarter of a mile from

the railroad crossing; that witness was traveling about 30 miles per hour, the weather was cool and visibility good.

Mrs. Meredith testified that she was with her husband the night Homer Reames was killed; that when they crossed the railroad tracks she saw the Frisco train back toward Emerson Electric; that when they were about even with the white house south of the concrete plant on the right the train was going across the highway; that after the train had crossed it they met a car going north about at the next house, a red brick; that was the only car they met before they turned off Highway EE. She said the red brick was the second house from the concrete plant on the right side.

On cross examination the witness testified that in her best judgment her husband's statement that the train was some 300 yards east when they crossed the tracks was wrong; that at the time they crossed the tracks, the train was moving. She testified that she looked back when they were at the white house and she had no difficulty in seeing the train; that she imagined the white house was about 700 feet from the crossing.

Mr. Meredith was recalled and testified that the lights were burning on the car he met going north toward the railroad crossing. He did not know what kind of car it was or how fast it was going. He testified it was about a quarter of a mile from the crossing when they met it; that he could not tell how many people there were in the car.

G. R. Wicker testified for plaintiff that his occupation was a civil engineer and he lived in Cape Girardeau; that he is the Dunklin County Surveyor and County Highway Engineer. He testified that he made a survey of Highway EE with reference to the railroad crossing on April 1, 1961, and prepared a plat which is in evidence as plaintiff's exhibit (A). His testimony is that he measured the distance from the first white house south of the intersec-

tion on the west side of Highway EE which was 788.6 feet; that the second house south, the brick house, is 215.80 feet south of the white house; that the distance from Washington Avenue to the intersection was 2,-721.20 feet; that the width of the highway at the point it intersects the south rail of the railroad track was 19.6 feet. Witness testified that the sight distance or diagonal line from the railroad intersection south on Highway EE is 1496.50 feet; that Highway EE is blacktopped; that it is approximately 375 feet from the railroad crossing to the beginning of the curve to the south on said highway; that there was nothing to obstruct one traveling on the highway from seeing the crossing.

Ryan testified: "Q. Now, during the time this engine was stationary there, in which direction were you looking? A. I was looking to the west."

He testified that as the train was approaching the crossing he looked to the south but while the train was temporarily stopped on the crossing he never looked to the south until he heard the tires squeal on the pavement.

The issue of inadequacy of damages raised by plaintiff in case No. 8040 is moot if the court finds for defendant in appeal case No. 8041, to-wit, that plaintiff failed to make a submissible case on the theory of humanitarian negligence. Therefore, we deem it proper to first render judgment in case No. 8041.

In this case plaintiff's contention is that defendant's engineer saw and knew, or could have seen and known, that Homer Reames was in a position of imminent peril and was oblivious thereto in time thereafter, by the exercise of ordinary care and with the means at hand and with reasonable safety to the equipment of said train and the persons thereon, to have sounded a warning that Highway EE was blocked by defendant's engine and that such warning, if given, would have been sufficient to cause deceased to have avoided running into the side of defendant's engine; that the engineer failed to sound a warning and was thereby negligent.

▉ Our review of the submissibility of plaintiff's case on this theory requires that we review the evidence in the light most favorable to plaintiff, and give the plaintiff the benefit of all reasonable inferences arising therefrom and disregard defendant's evidence unless it aids plaintiff's case. Kirks v. Waller, Mo.Sup., 341 S.W. 2d 860, 863 [2, 3]; Daniels v. Smith, Mo. Sup., 323 S.W.2d 705, 706 [2]; Fenneren v. Smith, Mo.Sup., 316 S.W.2d 602, 606. Favorable consideration of the evidence rule calls for a consideration of all the facts shown by plaintiff, not merely part of them isolated from the rest. Skidmore v. Haggard, 341 Mo. 837, 110 S.W.2d 726, 727 [1]; Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135. And it does not require courts to supply missing evidence, or disregard the dictates of common reason and accept as true that which obviously, under all the record, is not true, or to give plaintiff the benefit of any other than reasonable inferences. Kirks v. Waller, supra, page 863 [2, 3] (and see authorities cited therein).

▉ Plaintiff must remove her case from the field of speculation, conjecture or surmise. Hartlage v. Halloran, Mo.App., 331 S.W.2d 197 [1].

▉▉ The humanitarian rule seizes upon a factual situation as it exists at the time defendant knew or should have known that plaintiff was in a position of imminent peril. Carney v. Stuart, Mo.Sup., 331 S.W. 2d 558, 562 [4–6]. It is well settled that no duty on a defendant to act arises until plaintiff is actually in a position of imminent peril, and that when plaintiff is in a position of imminent peril is a question for the jury under all the evidence. Price v. Nicholson, Mo.Sup., 340 S.W.2d 1, 10 [6]; Harrington v. Thompson, Mo.Sup., 243 S.W.2d 519. *There must be substantial evidence from which the jury may make this determination.*

■ In the instant case to show zone of obliviousness, it is incumbent on plaintiff to make proof of facts tending to show obliviousness, not only to establish that deceased was in a position of imminent peril, but to bring home to defendant the knowledge of the peril. Cunningham v. Thompson, Mo.Sup., 277 S.W.2d 602.

In Zickefoose v. Thompson, 347 Mo. 579, 148 S.W.2d 784, 791 [10–11] (cited by both parties) the law is stated:

" * * * 'no duty whatever arises under that doctrine, unless and until a situation of peril comes into existence;' and 'when such peril arises the doctrine seizes upon the situation as it then exists and requires the one operating the dangerous instrumentality to exercise ordinary care * * * to make timely discovery of the peril, if it was his duty to be on the lookout, and thereafter to avoid the infliction of the threatened injury, if he can do so with the means at hand and without jeopardizing the safety of himself and others.' * * *

"Now in this case, since the engineer, conductor and brakeman Haefer were in places where they could not and did not know of deceased's peril, they had no present ability to save him. * * * the fact remains that Davidson was under no duty to leave his position or disregard his duties and let the train run wild. We think he acted properly in keeping his eyes on his work."

However, in that case, the fireman did actually see the truck approaching the crossing. He testified it was not going extremely fast but did not diminish its speed before it struck the box car. He called the engineer's attention to the approaching truck after the engine started to back up showing that he thought the situation was perilous. No warning signal was given.

■ Ordinarily, the presence of a train upon a public road crossing constitutes adequate notice to the travelers that the crossing has been preempted, and a railroad is not guilty of negligence in blocking crossings without providing additional warning, unless special circumstances make the crossing peculiarly hazardous, and burden of showing such special circumstances rests upon plaintiff. Allinson v. Missouri-Kansas-Texas Railroad Company, Mo.App., 347 S.W.2d 902, 905 [1]; Albertson v. Wabash Railroad Co., 363 Mo. 696, 253 S.W.2d 184, 187 [1]; Zickefoose v. Thompson, supra; State ex rel. Thompson v. Cave, 358 Mo. 414, 215 S.W.2d 435, 436 [1].

■■ The decisive questions presented in this appeal are when did deceased come into a position of imminent peril and what could defendant have done thereafter? The zone of imminent peril is always widened beyond the immediate path of a moving vehicle by the obliviousness of a person approaching its path. Crews v. Kansas City Public Service Co., 341 Mo. 1090, 111 S.W.2d 54, 57 [2]. This zone commences and the duty of a driver of a moving motor vehicle begins when he saw, or could have seen by the exercise of the highest degree of care, that the person approaching the path of his vehicle was oblivious to the dangers and was intent on continuing across his path. Homan v. Missouri Pacific R. Co., 334 Mo. 61, 64 S.W.2d 617. It was the duty of defendant's agents to act on reasonable appearances of obliviousness at a time when action would be effective. Womack v. Missouri Pacific R. Co., 337 Mo. 1160, 88 S.W. 2d 368. However, the zone of imminent peril is much narrower when the approaching person is not oblivious or shows no reasonable appearances of obliviousness. Under such circumstances, "the duty of such operator to act does not commence until such person is actually in its path or so close to it that it is apparent (at the rate of speed and manner he is moving) that he will not stop before reaching it". Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47, 53. "In the absence of obliviousness, the position or danger zone of imminent peril of a person approaching the path of a moving vehicle reaches no farther beyond the direct path of such moving vehicle than the distance within which such approaching person is unable by his own efforts to stop

short of it". Lotta v. Kansas City Public Service Co., 342 Mo. 743, 117 S.W.2d 296, 300; Yeaman v. Storms, 358 Mo. 774, Banc, 217 S.W. 495; Findley v. Asher, Mo.Sup., 334 S.W.2d 70, 72 [2–4].

█ Humanitarian doctrine does not impose any duty upon one to act until the situation of imminent peril arises and obliviousness to peril is constitutive element of humanitarian case based upon the failure to warn. Vietmeier v. Voss, Mo.Sup., 246 S.W.2d 785; Hampton v. Raines, Mo.App., 334 S.W.2d 372, 375; Beckwith v. Standard Oil Co., Mo.Sup., 281 S.W.2d 852; Dister v. Ludwig, 362 Mo. 162, 240 S.W.2d 694.

Defendant denies plaintiff's theory and urges that the evidence was wholly insufficient to authorize a submission of the case to the jury on humanitarian negligence since there was no proof that the engineer actually saw the deceased in a position of imminent peril and oblivious thereof in time to have given a timely warning.

█ We find from the evidence that plaintiff failed to make a submissible case upon either the theory of plaintiff or the theory of the defendant. This was a jury-tried case and the verdict and judgment must be sustained if there is substantial evidence to support it. In other words, there must have been substantial evidence from which the jury may make the determination that plaintiff was in a position of imminent peril and oblivious to his danger and that defendant saw or should have seen such obliviousness in time to have sounded a whistle which would have been effective in avoiding the collision.

█ The evidence offered is not in dispute. On the date of the collision between the automobile of deceased and defendant's engine, which occurred after dark, about 7:32 P.M., the engine was momentarily stopped blocking the crossing of the highway on which the deceased was traveling. The road for some 375 feet south of the crossing was straight and level and from there on south there was a slight curve but nothing to prevent deceased from seeing the engine across the highway. There was no evidence as to the speed of deceased's car except when it collided with the engine. There was evidence offered by plaintiff that the headlights on deceased's car were burning. Plaintiff offered no evidence as to the distance in which deceased could have stopped his car before striking the engine. The only evidence as to the time deceased saw defendant's engine was that the car left skid marks 66 feet long before it hit. Defendant's engineer testified for plaintiff that he was in the fireman's seat on the south side of the engine; that neither he or the fireman on the north side could have reached the cord to sound a whistle without moving from their seats. He testified that the train crew was preparing to put a car on the spur track at the Kennett Concrete Company west of the highway; that they had to switch the car ahead of them "what we call make a drop" and that he was looking to see if this car in the Kennett Concrete Company was in the clear so they could put the engine in there without striking the car. He testified that he did not see the approaching car of the deceased until he heard the squeal of the wheels as the brake was applied; that no signal was given. There is not the slightest evidence from which reasonable men could find that had defendant's engineer been looking to the south he could have determined that the deceased was oblivious to his danger in time to have sounded the whistle of warning which would have been effective. This was a blacktop road. Deceased's lights on the car were burning. We think the only inference from this evidence would be that the engineer could not have seen deceased even though under the law he had to act on appearances. Obliviousness was an essential element of plaintiff's case which must be shown by substantial evidence. We find she wholly failed to offer any evidence showing obliviousness.

Under the defendant's theory the presence of the train upon a public road or crossing constituted adequate notice to the travelers thereon that the crossing had been preempted and that while defendant's engine was momentarily blocking the road there was no further duty requiring defendant to give a warning to deceased traveling on the road unless the engineer saw or had actual knowledge of the deceased approaching said crossing.

The law in Zickefoose v. Thompson, supra, supports this contention. On page 791 [10, 11], it is stated:

" * * * 'no duty whatever arises under that doctrine, unless and until a situation of peril comes into existence;' and 'when such peril arises the doctrine seizes upon the situation as it then exists and requires the one operating the dangerous instrumentality to exercise ordinary care * * * to make timely discovery of the peril, if it was his duty to be on the lookout, and thereafter to avoid the infliction of the threatened injury, if he can do so with the means at hand and without jeopardizing the safety of himself and others.' * * *

"Now in this case, since the engineer, conductor and brakeman Haefer were in places where they could not and did not know of deceased's peril, they had no present ability to save him. * * * the fact remains that Davidson was under no duty to leave his position or disregard his duties and let the train run wild. We think he acted properly in keeping his eyes on his work."

■ In the instant case while defendant's engine was momentarily stopped, the engineer was engaged in carrying out the duties of spotting a car for some 15 to 25 seconds. Since the stopping of the engine across the highway is under the law permitted and since there is no duty imposed upon the defendant to give further warning, we think the engineer was not required to keep a constant watch to the south and disregard his duties in spotting the car on the spur track. Under this theory the defendant was not required to look, and, therefore, plaintiff failed to make a submissible case.

We find that the trial court erred in failing to sustain the defendant's motion for a directed verdict and its after-trial motion for judgment notwithstanding the verdict.

Judgment reversed with directions that judgment of the trial court be set aside and judgment entered for the defendant in case No. 8041.

Appeal case No. 8040 is without merit under our finding in case No. 8041. Judgment in this case is for the defendant. So ordered.

RUARK, P. J., concurs.

STONE, J., concurs in result.